## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Tyler Delorme, having been duly sworn, state as follows:

## INTRODUCTION AGENT BACKGROUND

1.  I am a Special Agent with the Federal Bureau of Investigations and have been since July 2017. Since December 2017, I have been assigned to the Organized Crime Task Force of the FBI's Boston Division. I have received extensive training in narcotics enforcement and illegal gambling and organized crime investigations, including the following: twenty-one (21) weeks of basic training at the FBI Academy in Quantico, Virginia, which included approximately three weeks of training related to organized crime and drug investigations, financial crimes and money laundering; and numerous hours of on-the-job training in illegal gambling and organized crime investigations. I have also attended a money laundering seminar regarding how criminals launder the proceeds of criminal activity.

2.  Many of the investigations in which I have participated were national in scope, and required me to work closely, and to share information and intelligence, with members of other law enforcement agencies, including the Massachusetts State Police ("MSP"), the Drug Enforcement Administration ("DEA"), Homeland Security Investigations, Alcohol Tobacco and Firearms ("ATF") and the United States Attorney's Office for the District of Massachusetts.

3.  Since 2023, I have been assigned to the Child Exploitation and Human Trafficking Unit with the Federal Bureau of Investigations.  My responsibilities in that role include conducting investigations on Human Trafficking, interviewing Human Trafficking victims and several other investigative techniques.  During my time in that unit, I have

participated in the investigation of several cases involving allegations of human trafficking. I serve on the FBI Child Exploitation and Human Trafficking Task Force, which is comprised of local, state, and law enforcement officials, many of whom have investigated hundreds of human trafficking cases. I have also read and observed expert testimony in the area of human trafficking.

4. As an FBI Special Agent, I have used various investigatory tools and techniques, including confidential informants, cooperating witnesses, undercover agents, physical surveillance, search warrants, telephone toll analysis, court-authorized electronic surveillance, grand jury investigations, and witness interviews. I am familiar with the benefits and limitations of these techniques. I have also participated in the execution of search warrants resulting in the seizure of bookmaking ledgers and related paperwork, both physical and electronic; United States currency; records of monetary transactions; bettor lists and other documents relating to illegal gambling; and computers, cell phones, and other electronic devices used in the conduct of illegal gambling businesses.

5. As a federal agent, I am authorized to investigate violations of United States laws, including, but not limited to, violations of 18 U.S.C. § 1591, and to execute warrants issued under the authority of the United States.

6. Based on my training and experience, I am familiar with the coercive methods that sex traffickers (colloquially known as "pimps") use to recruit, entice, transport, harbor, and arrange for victims to participate in commercial sex acts for the pimps' financial

benefit.[1] In the sex trafficking context, coercion means threats of serious harm to, or physical restraint against any person or any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person. Serious harm is any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue to perform commercial sexual activity in order to avoid incurring that harm.

7.   In my experience, because sex trafficking is a crime adjacent to the country's illegal narcotic and opioid epidemic, traffickers will often recruit drug addicted victims who are extremely vulnerable based on their addiction. Lured by the promise of an endless supply of drugs and seeking to avoid the profoundly brutal drug withdrawal symptoms, sex trafficking victims will often do anything to avoid getting sick. Traffickers know this and therefore prey upon these vulnerable victims to sell themselves for sex. Because selling sex is an extremely lucrative and mostly cash-based business, even after sex traffickers provide their victims with drugs, they are still able to make a great profit off the backs of their victims.

8.   This affidavit is submitted in support of an application for a criminal complaint charging MARVIN POMPILUS (hereinafter, "POMPILUS") with Sex Trafficking by Force, Fraud or Coercion in violation of 18 U.S.C. § 1591(a).

---

[1] In this affidavit, the term "commercial sex act" has the same definition as is set forth in 18 U.S.C. § 1591(e)(3).

9. As described below, there is probable cause to believe that between on or about 2021-2022, MARVIN POMPILUS did force a person known to the government, specifically VICTIM 1 to engage in commercial sex.

10. This affidavit is based on my personal investigation and investigation by others, including law enforcement officials whom I know to be reliable and trustworthy. The facts contained herein have been obtained by conferring with witnesses, other law enforcement officers and examining evidence obtained in the course of the investigation as well as through other means. This affidavit does not include every fact known to me about this investigation, but rather only those facts sufficient to establish probable cause.

## STATEMENT OF PROBABLE CAUSE

*Marvin POMPILUS did use force, fraud, or coercion to cause VICTIM 1 to engage in commercial sex.*

11. In February 2018, the defendant was convicted in Suffolk Superior Court of multiple counts of Trafficking a Person for Sexual Servitude and Deriving Support for Prostitution. He was sentenced to six years at MCI Cedar Junction. The defendant was released from his sentence on October 1, 2021, and shortly thereafter resumed his conduct of trafficking women.

12. VICTIM 1 indicated that she met POMPILUS, who she also knew as "Kise" in approximately late 2021/early 2022 when she was engaging in commercial sex. POMPILUS responded to a commercial sex advertisement that she posted online and,

posing as a sex buyer, contacted her in order to set up a date.[2]

13. POMPILUS called VICTIM 1 on the telephone to confirm the details of the date and arrived at her location with drugs.  Instead of engaging in commercial sex with VICTIM 1, POMPILUS attempted to recruit her to "work" for him. Based on my knowledge, training, and experience, victims of sex trafficking refer to "work" as engaging in commercial sex acts at the behest of a trafficker under coercive conditions. Specifically, POMPILUS offered to give her drugs and to "take care of her."[3]  He told her that if she worked for him, she would give him all the proceeds she made from engaging in commercial sex acts and he would provide her with clothes and food.

14. At that time, VICITM 1 was suffering from substance use disorder and was addicted to crack cocaine and heroin. If VICTIM 1 went without these drugs for long, VICTIM 1 would begin to experience withdrawal symptoms. While VICTIM 1 accepted narcotics from POMPILUS, she did not begin to work for him on their first meeting.

15. In early/mid 2022, VICTIM 1 lost her housing and began to stay at hotels, where she began again to engage in commercial sex.

16. One day during that time period, VICTIM 1 advertised herself for commercial sex on a website and a sex buyer arranged for a date.  The sex buyer arrived at a hotel in Brockton, MA to pay for sex with VICTIM 1 and when VICTIM 1 opened the door,

---

[2] I am aware that the term "date" in the commercial sex industry refers to an exchange of something of value, typically money or drugs, for a sex act.

[3] VICTIM 1 indicated that, in her experience, this meant to "pimp her out."

6

she realized that the sex buyer was POMPILUS.  Specifically, POMPILUS used a different telephone number than he had previously used to pose as a sex buyer in an effort to gain access to VICTIM 1.

17. VICTIM 1 cracked open her hotel room door and then tried to shut it once she realized it was POMPILUS who had arrived because she knew he was going to try to recruit her into working for him. POMPILUS pushed the hotel room door open and told her that going forward she was going to work for him.  POMPILUS took all of the cash that she had on her, which she approximated to be $1,000 dollars.  He left her with $100 worth of drugs and told her that he would be back and she better have more cash for him then.   VICTIM 1 understood this to mean that she find more sex buyers so she could pay POMPILUS. Approximately two hours later, POMPILUS returned to VICTIM 1's hotel room and asked her for the additional money that she had made from engaging in commercial sex.

18. From there, POMPILUS controlled all the online advertisements of VICTIM 1. POMPILUS posted photographs of VICTIM 1 and offered interested buyers access to her for a fee.  POMPILUS would use photographs that VICTIM 1 already had stored on her phone or sometimes POMPILUS would take pictures of VICTIM 1.

19.  On occasion, POMPILUS had VICTIM 1 post her own advertisements but POMPILUS ensured that he had access to and control of her commercial sex activity by gaining the passwords to her accounts.

20. POMPILUS gained access to VICTIM 1'S Text Now application[4], which was linked to the phone number posted on the advertisements.  VICTIM 1 would have to negotiate with sex buyers and POMPILUS required her to call him after every date.  After every date, POMPILUS would come and collect all the money from her.

21. At times, if POMPILUS was unable to supervise VICTIM 1, he had male acquaintances monitor her at the hotels where she was meeting sex buyers.

22. POMPILUS never drove[5] so he often had PERSON A, a person known to the government, drive VICTIM 1 to dates.    Specifically, PERSON A would drive VICTIM 1 to dates in Massachusetts and Rhode Island at various houses and hotels.  POMPILUS would always be the one to coordinate this transportation with VICTIM 1. Oftentimes, POMPILUS would travel in the car with PERSON A and VICTIM 1.  If POMPILUS did not travel with VICTIM 1 to the dates, she would have to call him immediately after meeting with sex buyers to arrange for him to collect all of the money she made.

23. PERSON A would also drive POMPILUS to deliver drugs to or pick up money from other vulnerable women who he was coercing to engaging in commercial sex for his financial benefit.

24. VICTIM 1 also worked out of various hotels for POMPILUS.  POMPILUS would

---

[4] TextNow is a Voice over Internet Protocol (VoIP) service that allows users to text and call any number in the United States and Canada when connected to WiFi, at no cost. The company provides users with a real phone number which can be used on any smartphone, tablet, or desktop computer with an internet connection.

[5] I have reviewed text messages of Pompilus where he confirms that he uses a driver.

have his male drug customers rent the rooms in which his victims would engage in commercial sex.  He did so to avoid using his name on hotel receipts in an effort to avoid detection by law enforcement.  POMPILUS'S drug customers would rent rooms for POMPILUS in exchange for narcotics from POMPILUS.

25. POMPILUS promised VICTIM 1 that he would take care of her and her children. Instead, POMPILUS physically beat VICTIM 1 on almost a weekly basis and never allowed her to seek medical treatment.  POMPILUS would punch VICTIM 1 in the face, kick her, and if she did not obey him, POMPILUS manually strangled VICTIM 1 to the point that she lost vision. POMPILUS manually strangled VICTIM 1 multiple times at a particular hotel in Massachusetts.

26.  POMPILUS used force and physical violence against VICTIM 1 if she attempted to keep any of the proceeds from commercial sex, refused to see a sex buyer, or if POMPILUS believed she was looking at other men.

27.  On one occasion, POMPILUS pointed a gun in VICTIM 1'S face and threatened her to continue to work by engaging in commercial sex.

28. POMPILUS routinely was verbally abusive toward VICTIM 1.  He would call her disgusting, spit in her face, laugh at her, and throw drinks on her.

29. POMPILUS forced VICTIM 1 to engage in sexual intercourse without her consent whenever he wanted to.   And while POMPILUS required VICTIM 1 to always use condoms with sex buyers, POMPILUS refused to wear a condom when he would rape and sexually assault VICTIM 1.

30. POMPILUS coerced VICTIM 1 to engage in commercial sex for several months.

During that time period, POMPILUS forced her to work for him every day.
POMPILUS had ultimate control over everything VICTIM 1 did, right down to how
much to charge customers for each date.

31. During that period of time, VICTIM 1 was addicted to crack and heroin and
POMPILUS provided her with those drugs all day every day.   VICTIM 1 was not
allowed to obtain drugs from anyone other than POMPILUS.  If VICTIM 1 broke this
rule, POMPILUS would physically assault VICTIM 1—using violence as a method
of fear and ultimate control.   As an alternate punishment, if VICTIM 1 attempted to
get drugs from anyone else, POMPILUS would stop giving her drugs, which would
cause VICTIM 1 to experience drug withdrawal and cause her to get extremely sick.

*In 2022, POMPILUS additionally trafficked VICTIM 2*

32. VICTIM 2 indicated that she met POMPILUS in 2022 when she began to rent a room
at the rooming house where he was living at in Brockton, MA (the "Brockton
Apartment").  At the time she moved into the Brockton Apartment and met
POMPILUS, VICTIM 2 was addicted to crack cocaine and heroin.

33. The first day that VICITM 2 moved into the Brockton Apartment, POMPILUS came
down to her room while she was unpacking and offered her drugs.  He told her that he
would provide her with a sample of drugs in his bedroom upstairs. VICTIM 2 went
up to POMPILUS'S bedroom on the third floor of the Brockton Apartment and used
fentanyl that she observed him obtain from his closet.  VICTIM 2 indicated that, in
addition to fentanyl, she observed POMPILUS to keep crack cocaine, powder

cocaine, and pills in that closet.

34. After ingesting POMPLUS's sample of fentanyl, VICTIM 2 passed out for several

hours.  Having not experienced many overdoses, when VICTIM 2 woke up on

POMPILUS'S bed, she asked him if there was anything in the fentanyl that would

have caused her to pass out. POMPILUS assured her that it was just "really good."

35. POMPILUS did not require VICTIM 2 to pay him for the sample of fentanyl he had

provided her.   POMPILUS told her that he would start her a tab that she would need

to work off.

36. VICTIM 2 started to regularly purchase crack cocaine and fentanyl from POMPILUS.

POMPILUS knew that VICTIM 2 was engaging in commercial sex and so he started

driving her to dates but only so that he could collect money that she had earned from

her engaging in commercial sex to pay down the tab he had created for her.

37. POMPILUS soon started forcing VICTIM 2 to do dates that he had arranged.

Specifically, POMPILUS began to send men who were buying drugs from him to do

dates with VICTIM 2.

38. POMPILUS then posted VICTIM 2 on new commercial sex websites that she was

unfamiliar with. POMPILUS was present when VICTIM 2 took photographs for the

new website and POMPILUS told her what to wear in the photographs.

39. PERSON A would drive VICTIM 2 and other girls to dates for POMPILUS in a U-

Haul truck.   PERSON A would also use that vehicle to drive POMPILUS to drug

deals and to collect money from other girls who were working for POMPILUS.

During the time that VICTIM 2 was being trafficked by POMPILUS, she observed at

least three other women engaging in commercial sex for POMPILUS's benefit.

40. POMPILUS established certain rules for VICTIM 2.  If VICTIM 2 did not tell
POMPILUS that she was going to do a date, or if she attempted to obtain drugs from
someone other than him, POMPILUS would get extremely angry.  Additionally,
VICTIM 2 was not allowed to have a boyfriend or talk to other men during the time
she was being trafficked by POMPILUS.

41. When POMPILUS became upset with VICTIM 2, he would yell at her and become
verbally abusive.  He would call her a "hoe" and other degrading names.

42. VICTIM 2 had to always stay in contact with POMPILUS.  If she did not respond to
him for a period of time, he would show up where she was in person and demand to
know where she had been.

43. VICTIM 2 was required to give all her proceeds from commercial sex to POMPILUS.
If she wanted money, she would have to ask him for it, a request that POMPILUS
always refused.  POMPILUS told VICTIM 2 that he was putting aside money for her
for clothes or to get her nails done.

44. While POMPILUS was never physically violent with VICTIM 2, she was aware that
he was violent toward VICTIM 5, another woman who he was trafficking.   VICTIM
2 observed POMPILUS be violent with VICTIM 5 and isolate VICTIM 5 in a
bedroom at the Brockton Apartment.  Knowing that POMPILUS was violent toward
VICTIM 5 contributed to VICTIM 2'S fear of him.

45. VICTIM 2 reported that, in total, she was trafficked by POMPILUS for
approximately two months in 2022.  During this period of time, POMPILUS would

provide her with both crack cocaine and fentanyl.   The amount of money she was required to give him daily from commercial sex far exceeded the worth of the drugs that he was giving her.

46. There were multiple occasions where POMPILUS would withhold drugs from VICTIM 2 such that she would start to experience withdrawal symptoms.  VICTIM 2 would give POMPILUS money and ask for drugs and he would withhold drugs from her to exert control over her or tell her that she had to make more money before he would give her drugs.  On those occasions, once VICTIM 2 would do a date, POMPILUS would give her drugs to ease her withdrawal.

47. As detailed below, at least one other witness, PERSON B, observed POMPILUS to withhold drugs from VICTIM 2 unless and until she went out and made money for him.

*In 2022, POMPILUS attempted to traffic VICTIM 3.*

48. In September 2022, VICTIM 3 was suffering from substance use disorder and had recently lost her housing and her job.  She posted on social media asking for help.

49. Soon thereafter, POMPILUS under his Facebook name sent VICTIM 3 a message. The two had a conversation where VICTIM 3 indicated that she was sick and needed drugs and POMPILUS drove to her location and provided her drugs.

50. POMPILUS used that opportunity to tell VICTIM 3 that he could give her a better life.  VICTIM 3 knew that other women were engaging in commercial sex for POMPILUS and took this to mean an offer to work for him by engaging in

commercial sex.

51. The following day, POMPILUS and VICTIM 3 communicated and VICTIM 3 told
    POMPILUS that she had no place to stay.  POMPILUS told her he would provide her
    with a place to stay as well as a ride.  POMPILUS sent an Uber for her to her location
    and ordered that Uber to bring her to the Brockton Apartment.

52. POMPILUS and VICTIM 3 left the Brockton Apartment so that POMPILUS could
    distribute narcotics. VICTIM 3 travelled with POMPILUS in a blue sedan to deliver
    drugs to various addresses.  During that car ride, POMPILUS discussed websites
    where girls can sell sex.   POMPILUS told VICTIM 3 that she should use
    "Skipthegames" and that she would have to create a profile and consistently post her
    advertisement across different social media sites.

53. During that car ride, POMPILUS repeatedly showed VICTIM 3 his balance on Cash
    App[6] and how it was increasing with each drug deal he made.  He also showed her
    two large wads of cash and counted $2300 from one of them in front of her.

54. POMPILUS and VICTIM 3 then returned to the Brockton Apartment where
    POMPILUS immediately required her to take a shower.   He told her that the
    following day she would be getting a hotel room to work out of and he would show
    her how to post on the websites.

55. VICTIM 3 went to bed that night at the Brockton Apartment and woke up to the
    defendant's hands on her vagina.  POMPILUS told her that, just like a drug dealer

---

[6] I am aware from Randolph Police Department's investigation that, as of September 2022,
POMPILUS was using CashApp to collect payment from drug customers and had a significant
amount of money in his CashApp account(s).

14

needs to test his drugs, he needed to test her for sex before he sold her for money. The

defendant then had sex with her.  VICTIM 3 felt like she had to comply since he was

her only source of food, shelter, and drugs.

56. The following morning, POMPILUS and VICTIM 3 then got in the car that

POMPILUS had been driving to drive to Holbook, MA so POMPILUS could deal

drugs.  During that car ride, POMPILUS told VICTIM 3 that all the money that she

made at the hotel that day was going to go to him.  Before they could arrive at the

hotel, the car was pulled over and POMPILUS was executed on a state arrest

warrant.[7]

*Additional Corroboration of Sex Trafficking*

57. Multiple witnesses have described knowledge of some or all of POMPILUS's pattern

of prolific drug distribution and recruitment of women into commercial sex.

58.  PERSON A provided evidence of POMPILUS'S drug and sex trafficking.

a.  A witness known to the Government (Person A) confirmed that he was living in a

UHAUL truck from March until May 2022 having been evicted from his

apartment.

b.  PERSON A indicated that, at some point during that period of time, VICTIM 2

introduced him to a person she referred to as "K" at the Brockton Apartment.  On

---

[7] I am aware that on September 22, 2023 POMPILUS was arrested on a state arrest warrant with
trafficking weight of drugs on him and with VICTIM 3 in the car. VICTIM 3 was also arrested on
a warrant.

that day, PERSON A drove POMPILUS and VICTIM 2 to more than one location where VICTIM 2 would exit the car, enter a residence, and return a short time later with money.

c.  PERSON A indicated that, from there, POMPILUS got his phone number and called him for future rides.  PERSON A estimated that from March 2022 until May 2022, he drove POMPILUS or drove people for POMPILUS four or five times.

d.  In exchange for driving him around, POMPILUS would give PERSON A money for gas and cigarettes as well as "a couple of hits of crack cocaine."

e.  On at least one occasion, POMPILUS had PERSON A pick up a female in Randolph or Braintree in the middle of the night and return her to the Brockton Apartment.  POMPILUS paid PERSON A $30 or $40 for that trip.

f.  On at least two occasions PERSON A drove POMPILUS to an address in Quincy or Weymouth, waited for him and then drove him back.  POMPILUS told PERSON A that he was selling drugs and would discuss how much money he made.

59.  PERSON B, a witness known to the Government, provided evidence of POMPILUS'S drug and sex trafficking.

a.  PERSON B indicated that, on at least one occasion, POMPLIUS offered to sell her drugs.

b.  PERSON B indicated that she observed evidence that POMPILUS was trafficking

VICTIM 4 at the BROCKTON APARTMENT.  Specifically, VICTIM 4 told PERSON B that she was being forced to do whatever dates POMPILUS told her to do and that she could not leave or POMPILUS would kill her.

c.  On one occasion, PERSON B heard POMPILUS AND VICTIM 4 arguing, heard banging noises, and then saw VICTIM 4 emerge from POMPILUS'S bedroom with a bloody nose.

d.  PERSON B observed POMPILUS be physically violent with at least two additional women who have yet to be identified.  PERSON B routinely saw VICTIM 4 and the unidentified females to have red marks around their neck and injuries to their faces.

e.  PERSON B saw POMPILUS traffic VICTIM 2.  Specifically, she saw POMPILUS give VICTIM 2 certain clothes that she was required to wear and direct her to meet dates at a local bank.  POMPILUS told VICTIM 2 that she could not come home with less than a certain amount of money.

f.  PERSON B observed POMPILUS provide VICTIM 2 with drugs and then withhold drugs from her if she was not making enough money.

60. PERSON C, a witness known to the Government,  provided evidence of POMPILUS'S drug and sex trafficking.

a.  PERSON C indicated that POMPILUS reached out to her on Facebook in late 2021/early 2022 and asked to get to know her.  PERSON C communicated with POMPILUS for months until ultimately starting a relationship with him in the

summer of 2022.

b.  In the summer of 2022, POMPILUS randomly showed up at PERSON C'S house and told her that he could make her happy and "give her the world."

c.  During that time, POMPILUS was bragging to PERSON C about dealing drugs and she witnessed him sell drugs at the Brockton Apartment.

d.  One day, while at the Brockton Apartment, POMPILUS told PERSON C that his car was not operable and asked to use her vehicle.

e.  PERSON C saw multiple people calling all of POMPILUS'S 3-4 different cell phones to attempt to arrange drug transactions.  POMPILUS then used PERSON C's car to begin to deal drugs "every day, all day."  In exchange for the use of her car, POMPILUS would give PERSON C drugs.

f.  PERSON C observed POMPILUS use her car to deal heroin and crack cocaine all along the south shore of Boston.

g.  One multiple occasions, POMPILUS told PERSON C that drug addicted women who were his friends would go see some of the men that he was also dealing drugs to.   PERSON C indicated that all the money that those women made would go to POMPILUS to purchase drugs from him.

h.  On multiple occasions, POMPILUS would refer to VICTIM 5, in front of PERSON C, as his "moneymaker" and his "bread winner."  POMPILUS told PERSON C that VICTIM 5 made a lot of money for him.

i.  VICTIM 5 told PERSON C that she was working for POMPILUS by engaging in commercial sex.  PERSON C observed VICTIM 5 work out of the Brockton

Apartment as well as specific hotels in Brockton, MA.

j.  During that period of time, PERSON C observed VICTIM 5 to regularly receive drugs from POMPILUS.

k.  PERSON C observed POMPILUS to use his cell phone to post and sell VICTIM 5.  PERSON C also observed VICTIM 5 coming to POMPILUS for access to the website on which she was posted and observed that POMPILUS had total control over the website.

l.   PERSON C observed POMPILUS or another individual drive VICTIM 5 to dates after she would be advertised on Skipthegames and POMPILUS admitted to PERSON C that VICTIM 5 was doing dates and making money for him.

m.  PERSON C also observed text messages between POMPILUS and at least three other women where he was telling them that they could make so much money if they worked for him.  POMPILUS would tell these women to go "get the bag."

n.  PERSON C drove POMPILUS around for approximately 30 days until she was in a car accident and could no longer drive for him.  After PERSON C would no longer drive for POMPILUS, he ceased communication with her.

o.  POMPILUS was violent with PERSON C on at least one occasion,  threatening to physically assault her.

61. PERSON D, a witness known to the Government, provided evidence of POMPILUS'S sex trafficking.

a.  In 2022, PERSON D was introduced to POMPILUS over Facetime.  POMPILUS

started to regularly sell her fentanyl.  PERSON D described the fentanyl that
POMPILUS was dealing as quite potent and even described overdosing on it at
one point.

b.  Shortly thereafter, PERSON D started a sexual relationship with POMPILUS.
POMPILUS insisted that PERSON D rent a car in her name to drive him around
but he would give her money to pay for it.

c.  PERSON D indicated that she would accompany POMPILUS to sell drugs all day
everyday.  Drug buyers would contact POMPILUS on one of his three phones and
he would respond to them by call or text to arrange the drop off of drugs.

d.  PERSON D described driving POMPILUS around for approximately 6 weeks
during the summer of 2022.   PERSON D saw POMPILUS deal crack cocaine
and fentanyl and receive payment via cash and CashApp.

e.  On one occasion, POMPILUS asked PERSON D to rent a hotel room in her name
so that VICTIM 5 could engage in commercial sex out of it.  During that time,
PERSON D drove POMPILUS to the hotel to collect the cash that VICTIM 5
made by engaging in commercial sex.  PERSON D observed POMPILUS to give
VICTIM 5 drugs in return.

f.  POMPILUS told PERSON D that he was a pimp and that he "sold dreams" and
that he promised women houses and cars and they thought they were actually
going to get those items one day.

g.  During the six weeks that PERSON D was with POMPILUS, POMPILUS
threatened to kill her.

62. PERSON E corroborated POMPILUS'S drug and sex trafficking.

   a.  PERSON E indicated that she met POMPILUS at the Brockton Apartment at some point in 2021-2022.

   b.  The first day that PERSON E moved into the Brockton Apartment, POMPILUS approached her and offered to sell her fentanyl or cocaine.  PERSON E started regularly purchasing drugs from POMPILUS.

   c.  On multiple occasions, PERSON E drove POMPILUS around to deal drugs.

   d.  On multiple occasions, POMPILUS attempted to recruit PERSON E to engage in commercial sex for him.

   e.  PERSON E observed POMPILUS traffic VICTIM 4.  Specifically, she observed VICTIM 4 engage in commercial sex and then give all the proceeds to POMPILUS in exchange for drugs.   PERSON E heard VICTIM 4 complain that the amount of drugs that POMPILUS was giving her was not enough for the money she was providing him.

   f.  On at least one occasion, PERSON E observed POMPILUS be physically violent with VICTIM 5.  Specifically, she observed POMPILUS hit VICTIM 5 in the side of the head while he was yelling at her.

   g.  PERSON E saw POMPILUS have access to a firearm.

63. Law Enforcement corroborated some aspects of the defendant's enterprise from September 2022.

a. In August and September 2022, investigators with the RPD conducted

surveillance and observed POMPILUS regularly travel to locations known to be

frequented by drug sales and users.  In these instances, investigators observed that

POMPILUS was the passenger in vehicles driven by other individuals and further

observed POMPILUS meeting briefly with various individuals that appeared

consistent to the investigators (based on their training and experience) with drug

trafficking activities.  Some of the individuals met by POMPILUS themselves had

prior arrests for drug-related conduct.

b. On September 23, 2022, investigators with the Randolph Police Department

executed several search warrants.  Investigators arrested POMPILUS on an

outstanding arrest warrant (for failure to register as a sex offender).  During a

subsequent search of POMPILUS, investigators seized drugs that had been

concealed in or around POMPILUS's groin area and that were only recovered

after a drug-detecting canine positively alerted to the presence of narcotics.

Subsequent forensic testing of the drugs POMPILUS had hidden in his groin area

included 69.9 grams of cocaine and 10.14 grams of a substance containing both

fluorofentanyl and fentanyl.

c. At the time of POMPILUS's arrest, investigators also seized cellular phones, US

currency believed to be drug proceeds and drug paraphernalia.   Experienced

drug investigators subsequently searched POMPILUS's mobile phone and

discovered a large number of text messages that, although coded, investigators

believed were drug-related.  Among other things, there were text messages from

22

customers that investigators believed concerned requests for fentanyl (*"a 20 of fett pls"*) and discussions of an overdose from drugs sold by POMPILUS (*"when you gave me that last shit, I died"* and *"I don't think you cook it. I almost didn't come back. 6 narcan"*).

## **CONCLUSION**

64.     Based on the foregoing, I respectfully submit that there is probable cause to support a criminal complaint charging MARVIN POMPILUS with the Sex Trafficking by Force, Fraud, or Coercion of VICTIM 1, in violation of 18 U.S.C. § 1591(a)(1) (b)(1).

*Tyler Delorme /by Paul G. Levenson*
_____
Tyler Delorme
Special Agent
Federal Bureau of Investigations

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by phone, on this 13th day of November 2023
at Boston, Massachusetts.

_____
HONORABLE       Paul G. Levenson
UNITED STATES MAGISTRATE JUDGE